| | |
|---|---|
| **REID COLLINS & TSAI LLP** | Hearing Date:  October 16, 2013 |
| Angela J. Somers | Time:  9:45 a.m. |
| Jeffrey E. Gross | Objection Date:  October 9, 2013 |
| One Penn Plaza, 49th Floor | Time:  4:00 p.m. |
| New York, New York  10119 | |
| 212.344.5200 (telephone) | |
| 212.344.5299 (facsimile) | |

*Special Counsel for Trustee/Plaintiff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X          Chapter 7

In re:                                                                          Cases No.     10-11727 (REG)
                                                                                                    10-15393 (REG)
PALI HOLDING, INC., and
PALI CAPITAL, INC.

                                         Debtors.

-------------------------------------------------------X

YANN GERON, Chapter 7 Trustee of the Estates of          Adv. Proc. No.     13-01178 (REG)
Pali Holdings, Inc. and Pali Capital, Inc.,                                              13-01179 (REG)

                                         Plaintiff,

                - against –

RICHARD ABRAHAMS, RICHARD ANTHONY,
BRADLEY BERK, PETER BORISH, BERT R.
COHEN, JOHN FEDDERS, KEVIN FISHER,
GARY FREEDMAN, TIMOTHY PARROTT,
BRADLEY REIFLER, JOSEPH SCHENK, DAVID
WASITOWSKI, RONALD WEINSTEIN, and
REIFLER CAPITAL ADVISORS, INC.,

                                         Defendants.
-------------------------------------------------------X

**MOTION FOR AN ORDER (I) PURSUANT TO BANKRUPTCY CODE 105(A) AND
BANKRUPTCY RULE 9019(A) APPROVING A SETTLEMENT AGREEMENT
AMONG THE TRUSTEE, THE DEFENDANTS, AND THE UNDERWRITERS; AND
<u>(II) AUTHORIZING PAYMENT OF COUNSELS' CONTINGENCY FEES AND EXPENSES</u>**

Yann Geron, as Chapter 7 Trustee ("**Trustee**") of Pali Holdings Inc. ("**Pali Holdings**")

and Pali Capital, Inc. ("**Pali Capital**") (together "**Pali**" or the "**Debtors**"), moves pursuant to

Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rules**") 9019(a) for entry of an order: (I)

1

approving the settlement of these adversary proceedings as set forth in the Stipulation of Settlement (the **"Stipulation"**) among: (a) the Trustee, (b) the above-captioned defendants ("**Defendants**"), and (c) Brit Insurance Syndicate 2987 and Lexington Insurance Company (collectively, "**Underwriters**"); and (II) pursuant to Bankruptcy Code §§ 327, 328, and 330, approving and awarding the payment of certain fees and disbursements to the Trustee's (a) Special Counsel, Reid, Collins & Tsai LLP (**"Special Counsel" or "RCT"**), and (b) general counsel, Fox Rothschild LLP ("**Bankruptcy Counsel**" or "**Fox Rothschild**"), and represents as follows:

## PRELIMINARY STATEMENT

1.  After his appointment, the Trustee and his counsel, Fox Rothschild, began to investigate potential breaches of fiduciary duties and other wrongful acts committed by Pali's former directors and officers that may have contributed to Pali's downfall. In connection with this investigation, Bankruptcy Counsel reviewed numerous documents and conducted several Rule 2004 examinations and informal interviews of former officers and directors, in addition to engaging in many other activities. Having concluded that claims may exist, the Trustee thereafter retained Special Counsel to commence a suit against Pali's former directors and officers. On February 5, 2013, the Trustee commenced two substantially identical adversary proceedings ( the "**Adversary Proceedings**") against thirteen individuals and one entity. The Adversary Proceedings asserted various common law and statutory claims allegedly relating to wrongful acts that the Trustee contended caused damage to the Debtors.

2.  Soon after the commencement of the Adversary Proceedings, the Trustee and the Defendants in the Adversary Proceedings entered into settlement discussions, along with counsel for the Underwriters. The Underwriters are the subscribers to Directors & Officers & Company

2

Reimbursement Policy Number B0572NA072488 issued to Pali Holdings for the policy period of June 21, 2007 to June 21, 2008 (the "**Policy**").  Under the terms of the Policy, the limit of liability is reduced by any legal fees paid out by Underwriters relating to the defense of an action concerning a covered claim.  After several months of discussions, presentations, and rigorous negotiations among the parties and the Underwriters, all interested parties agreed upon the terms of a settlement (the **"Settlement"**) as memorialized in the Stipulation, whereby the Underwriters would pay $5,350,000 to the Trustee, of which $565,000 would be paid to Defendants' counsel for their covered fees.  In addition to this recovery from the Underwriters arising from the Policy, two individual Defendants agreed to be jointly and severally responsible for paying an additional $375,000.  The full and complete terms of the parties' agreement is set forth in the Stipulation, attached hereto as Exhibit A.

3.      As set forth in greater detail below, the Trustee has determined that the Settlement is in the best interest of the Estates and that it will bring significant benefits to the estates.  Accordingly, the Trustee respectfully requests that the Court approve the Settlement.  By this application, Trustee also seeks authority to pay certain contingency fees and disbursements to Trustee's Special Counsel and Bankruptcy Counsel.

## BACKGROUND

4.      Pali Holdings, and its U.S. broker-dealer subsidiary, Pali Capital were a sales and trading and financial advisory company.

5.      On April 1, 2010, Pali Holdings filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  By Order dated November 8, 2010, Pali Holdings' Chapter 11 case was converted to a Chapter 7 case.

3

6. On October 14, 2010, Pali Capital filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (together with the Pali Holdings filing date, the "**Filing Dates**").

7. The Trustee was thereafter appointed as the Chapter 7 Trustee of both Pali Holdings and Pali Capital. The Trustee has since qualified, and is currently serving, as permanent trustee of the Pali estates.

8. Prior to the Filing Dates, the Debtors purchased the Policy, which covered the period of June 21, 2007 to June 21, 2008 and had a $10 million aggregate limit of liability. In accordance with the terms of the Policy, the limit of liability is reduced by any legal fees paid out by the Underwriters relating to the defense of an action concerning a covered claim. A notice of a claim and/or wrongful act was previously filed under the Policy.

9. The Trustee investigated potential claims against former officers and directors of the Debtors. As part of the investigation, the Trustee and its counsel interviewed witnesses, reviewed extensive documents, and conducted several examinations pursuant to Rule 2004. The Trustee began to prepare a complaint against several of the individuals who were ultimately sued in the Adversary Proceedings. In late 2012, the Trustee determined that it was in the best interest of the Estates to hire contingency counsel to prosecute the claims against the former officers and directors.

### I. Development and Pursuit of Adversary Proceedings

#### A. Developing the Causes of Action

10. Prior to commencing the Adversary Proceedings, the Trustee through his Special Counsel engaged in an analysis of the potential causes of action against directors and officers as well as a careful review of the relevant insurance policies. Special Counsel reviewed many

4

documents that formed the factual basis of the claims, including the Rule 2004 examination transcripts (which had been conducted by Bankruptcy Counsel) of the various officers and directors of Pali and the deposition transcripts in the various actions commenced before Pali's demise.  Special Counsel researched and drafted memorandum on a variety of legal issues, including duties of directors and statutes of limitations under various state laws, statute of limitations issues, the effect of FINRA regulations, and jurisdictional issues, among other issues. Special Counsel also reviewed the pleadings of many of the prior litigations and proceedings – including an Article 78 proceeding and derivative action, as well as an internal investigation performed by Pali and its prior counsel and consultants – to determine how they would affect the claims that the Trustee could assert.  Because Bankruptcy Counsel had also performed work on certain of these issues, Special Counsel conferred with Bankruptcy Counsel on numerous calls and meetings to understand the work that it had done prior to the Special Counsel's involvement and to further develop the issues.

11. The Trustee, with the aid of Special Counsel, further considered the insurance policies that could provide coverage for acts of the directors and officers during the relevant time periods.  In particular, Special Counsel reviewed old notices that Pali had provided before filing for bankruptcy to identify potential coverage.  Once a basis for coverage was established, Special Counsel reviewed potential exclusions or other barriers to coverage and refined the claims that the Trustee would assert.  Special Counsel also considered potential sources of recovery outside of the Policy.

12. During the course of this analysis, Special Counsel consulted with the Trustee regularly, reporting on this analysis and establishing strategy with the Trustee's review and approval.

5

**B.    Commencing the Adversary Proceedings**

13.    Once this preliminary review process was completed, complaints were drafted and filed on February 5, 2013 (the "**Complaints**"). The Complaints stated, among other things, claims for breach of fiduciary duty against former officers and directors of Pali. In the Complaints, the Trustee alleged that Pali was ruined by a lax compliance culture that concealed repeated wrongdoing by Pali's insiders, including its co-founders, Bradley Reifler ("**Reifler**") and Bert Cohen ("**Cohen**"). The Complaints further alleged that ultimately, this lack of safeguards led to a destructive battle for control between Reifler and Cohen, who accused each of nefarious schemes and misdeeds. The Trustee further alleged that, once Reifler was ousted as Chief Executive Officer, the wrongdoing continued because the next CEO plotted to buy the company out on the cheap and devalued the company.

14.    The Trustee asserted claims against some or all Defendants for: (i) breach of fiduciary duties, (ii) fraudulent transfers under Sections 544 and 550 of the Bankruptcy Code and Section 276 of New York's Debtor-Creditor Law; (iii) turnover under Sections 541 and 542 of the Bankruptcy Code; (iv) disallowance of Defendants' Proofs of Claims; (v) corporate waste; (vi) violating the faithless servant doctrine; (vii) aiding and abetting breach of fiduciary duty; (viii) breach of contract; and (ix) indemnity and contribution.

15.    Simultaneously with filing the Complaints, Special Counsel continued to advance its work towards proving the Trustee's claims. Special Counsel reviewed and advised the Trustee in detail of compliance procedures, Pali board committee membership and practices, best practices standards relating to boards and committees thereof, and applicable Rule 2004 testimony in relation to these issues. Special Counsel also reviewed electronic and hard copy Pali records and created a detailed chronology of events. Furthermore, Special Counsel

6

interviewed witnesses who had material information relating to the claims. Annexed hereto as <u>Exhibit B</u> is the Verified Statement of Angela J. Somers in Support of Application for Allowance of Compensation by RCT ("**Verified Statement**") that provides additional information about the tasks performed.

### C. The Policy and the Long and Protracted Negotiation Process

16. Because the Policy has a $10 million limit of liability and is a wasting policy, whereby Defendants' legal fees were reimbursable under the Policy and reduced the limit available for coverage, Special Counsel advised the Trustee and the Trustee determined that it was in the best interest of the Estates to pursue settlement discussions early in the cases. The risk of dissipation of the Policy was magnified by the fact that eight separate law firms represent the fourteen Defendants.

17. Accordingly, the Trustee through Special Counsel began to negotiate with the Defendants both in various groups and on a Defendant-by-Defendant basis. The negotiations were long, intense, and, at times, contentious. Defendants raised a myriad of potential defenses and factual circumstances weighing against liability. These included: (i) one Defendant's contention that a written release barred any claims against him; (ii) one Defendant's claim that he was never an employee of Pali, (iii) various Defendants' arguments that they served short periods of time on the Board, thereby insulating them from liability or reducing potential damages; (iv) contentions by some Defendants that they were judgment-proof, among many other individual issues. As to each of these assertions, Special Counsel obtained documents and researched and investigated the basis for such contentions and the appropriate response thereto. With the Trustee's approval, Special Counsel also employed a consultant to assist in addressing

7

these issues, including FINRA issues and corporate governance, and to refine Trustee's claims in light of the developing issues in the case.

18. Thereafter, Trustee, through Special Counsel, engaged in a series of meetings with certain Defendants, on a daily or, at a minimum, weekly basis, as the Defendants were loosely divided into four primary groups of similarly-situated parties. When meeting with certain of the groups, Special Counsel made a formal PowerPoint presentation on behalf of the Trustee that summarized the claims based on extensive and detailed legal and factual research. In addition, on many calls, Special Counsel and defense counsel addressed the strengths and weaknesses of various contentions with legal and factual analysis. Furthermore, as noted above, discussions with one Defendant group included a demand for payment beyond any recovery under the Policy, which was eventually incorporated into the Settlement.

19. Special Counsel also met directly with the Underwriters' counsel, who was closely involved in the settlement discussions. During the negotiations, Special Counsel conducted additional research and analysis concerning the Policy, notices, potential exclusions, the timing of the Policy period, and contentions by the Underwriters concerning possible avoidance of coverage.

20. The culmination of all this work, as well as back-and-forth negotiation on the economic terms, led to the Settlement. Once the parties agreed to the economic terms of the Settlement, there were subsequent negotiations about the complex terms of the releases and other non-economic issues. The Trustee through Special Counsel then met with the Underwriters to ensure that the Settlement was acceptable to them. After weeks of drafting, the parties agreed upon the terms of the Stipulation, which are now before this Court for approval, and which

provide the basis for Special Counsel's and Bankruptcy Counsel's fee request pursuant to its contingent fee arrangement.

### II. The Stipulation of Settlement

21. As set forth in the Stipulation, the claims against Defendants were settled by promises to make payments to the Trustee by: (i) Brit Insurance Syndicate 2987, and Lexington Insurance Company (the "Underwriters") of the sum of $5,350,000 (the "**Underwriters Payment**"), of which amount, the Trustee shall pay to Defendants' Counsel in connection with the claims by Defendants for coverage $565,000 ("**Defendants' Counsel Fees**"); and (ii) Bert Cohen and/or Brad Berk of the sum of $375,000 (the "**Cohen Payment**").

22. Accordingly, the total of the Underwriters Payment plus the Cohen Payment less the Defendants' Counsel Fees will result in a net amount of $5,160,000 to be recovered by the Trustee for the benefit of the Estates. This net recovery will be reduced by the fees of the Trustee's Special Counsel and Bankruptcy Counsel, which are further detailed below. Moreover, in order for the Trustee to enter into the most advantageous agreement for the Estates, Special Counsel agreed to reduce its fees by $115,000.

23. In the Stipulation, the parties exchanged releases in the forms set forth therein. The parties also agreed to dismiss the Adversary Proceedings and other pending proceedings, including a FINRA arbitration and Defendants' motions to withdraw the reference, upon approval of the Stipulation. Defendants further agreed that any and all proofs of claim filed by Defendants will be disallowed and expunged.

### III. Basis for Approval of the Settlement

24. Bankruptcy Rule 9019(a), which governs the approval of compromises and settlement, provides:

9

> [o]n motion by the trustee and after notice and hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.[1]

25. In approving a compromise and settlement, the Bankruptcy Court is required to make an "informed and independent judgment" as to whether the compromise and settlement is fair and equitable based on an:

> [e]ducated estimate of the complexity, expense and likely duration of [any] litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process, in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.[2]

26. In making its determination on the "propriety of the settlement," the Court should consider whether the proposed settlement is in the "best interest of the estate."[3] As stated in *Arrow Air*, the "approval of [a] proposed compromise and settlement is a matter of this Court's sound discretion." *In re Arrow Air*, 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988). In passing upon a proposed settlement, "the bankruptcy court does not substitute its judgment for that of the trustee." *In re Depo*, 77 B.R. at 384 (citations omitted). The bankruptcy court is not required "to decide the numerous questions of law and fact raised by [objectors] . . . . [R]ather [the Court should] canvass the issues and see whether the settlement falls below the lowest point in the

---

[1] Fed. R. Bankr. P. 9019(a).

[2] *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425, *reh'g denied*, 391 U.S. 909 (1968). *See In re Arrow Air, Inc.*, 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988); *In re Bell & Beckwith*, 77 B.R. 628, 611 (Bankr. N.D. Ohio), *aff'd*, 87 B.R. 472 (N.D. Ohio 1987); *Cf. Magill v. Springfield Marine Bank (In re Heissinger Resources Ltd.)*, 67 B.R. 378, 383 (C.D. Ill. 1986) ("the law favors compromise").

[3] *Handler v. Roth (In re Handler)*, 386 B.R. 411, 420 (Bankr. E.D.N.Y. 2007) (quoting *In re Adelphia Communications Corp.*, 327 B.R. 143, 158 (Bankr. S.D.N.Y. 2005)); *Depo v. Chase Lincoln First Bank, N.A. (In re Depo)*, 77 B.R. 381, 383 (N.D.N.Y. 1987), *aff'd*, 863 F.2d 45 (2d Cir. 1988).

range of reasonableness."[4] In passing upon the reasonableness of a proposed compromise, the Court "may give weight to the opinions of the Trustee, the parties and their counsel." *Bell & Beckwith*, 77 B.R. 606, 612 (Bankr. N.D. Ohio 1987), *aff'd,* 87 B.R. 472 (N.D. Ohio 1987); *See In re Handler*, 386 B.R. 411, 421 (Bankr. E.D.N.Y. 2007).

27. The Second Circuit in *In re Iridium Operating LLC* outlined the following seven factors (the "Iridium Criteria") to be considered by a court in deciding whether to approve a compromise or settlement:

   i. the balance between the litigation's possibility of success and the settlement's present and future benefits;

   ii. the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment if the settlement is not approved;

   iii. the paramount interest of the creditors, including the proportion of class members who do not object to or who affirmatively support the settlement;

   iv. whether other parties in interest support the settlement;

   v. the competency and experience of the counsel who support the proposed settlement;

   vi. the relative benefits to be received by individuals or groups within the class; and

   vii. the extent to which the settlement is the product of arm's length bargaining.

*See In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

28. The settlement set forth in the Stipulation satisfies each of the Iridium Criteria. The Settlement affords the Trustee the ability to settle the Trustee's claims without having to

---

[4] *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert denied*, 464 U.S. 822 (1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972), *cert denied*, 409 U.S. 1039 (1972); *See In re Handler*, 386 B.R. at 420-21.

engage in extensive motion practice, formal discovery, and trial, which would generate greater costs of time and money. As explained below, while Special Counsel and Bankruptcy Counsel (with respect to this matter) work on a contingency fee basis, costs incurred by Defendants' counsel are paid directly out of the Policy proceeds. As such, the cost of litigation becomes an important factor that influences settlement, since additional litigation costs of the covered Defendants necessarily reduces coverage available under the Policy.

29. In considering the likelihood of success of the case, the Trustee addressed issues including the statutes of limitations, jurisdictional issues, the organizational structure of Debtors, and likely arguments by Defendants about causation, including Defendants' claim that subsequent events, such as the global and national financial crises, contributed to Pali's demise. Two of the Defendants were likely to argue that claims against them had to be the subject of FINRA arbitration rather than litigation. Defendants were prepared to litigate this matter vigorously and aggressively. The Trustee also understood that litigation involves uncertainty, would take possibly several years, and that the number of Defendants and their individualized defenses would add to the complexity of the situation.

30. The Trustee also considered the existence and availability of the Policy to cover certain liability on the part of the Defendants. Critically, the Policy provided that the Underwriters shall pay defense costs incurred by the Defendants out of the Policy. The effect of this was that pursuing the action through litigation would potentially exhaust a significant portion of the $10 million Policy limit. Indeed, the amount of the Defendants' counsel fees, which are being paid under the Settlement, is $565,000, and this amount was incurred by the Defendants even before they had answered or filed motions to dismiss, further underscoring the severity of the risk of depletion of the policy.

12

31. The Trustee also considered facts that affected the ability to collect upon a judgment against all Defendants. Some Defendants, most notably Reifler, are the subject of claims by other creditors that may result in substantial judgments being entered against him before this litigation was concluded in favor of the Trustee. For other Defendants, it is likely that some assets may be held offshore and/or in trusts, and therefore difficult to access. For all Defendants, the likely exhaustion of the Policy would have resulted in some depletion of their individual assets on the continued defense of the Adversary Proceedings.

32. Furthermore, the litigation is complex, based in no small part on having fourteen Defendants, some of whom were officers and directors, and some of whom were solely directors. Many of the directors had overlapping but different tenures on the Boards, creating complexity in terms of the timing of the alleged wrongdoing by various Defendants. Moreover, some Defendants were directors of both Pali Capital and Pali Holdings, while others were directors solely of Pali Holdings. The claims against Schenk involved many different witnesses and facts because his tenure as CEO began after Reifler was ousted. Lastly, the volume of hard copy and electronic records concerning Pali, not including the records created by Pali's former lawyers and consultants, is massive, which would have made discovery costs, including e-discovery costs, substantial.

33. In contrast, the Settlement provides a substantial and immediate benefit to the Estate that avoids all the litigation costs and risks, avoids further depletion of the Policy, and provides a final assured resolution of the claims. Under the Stipulation, the payment will be received promptly after any Order approving the Settlement becomes a final order. This multi-million dollar recovery represents the largest recovery to-date for the Estates.

13

34. Finally, the Stipulation was the product of hard-fought arm's length bargaining, as described above. The active negotiation process to settle the Adversary Proceedings began in March of 2013 and continued to the date of the Settlement. The negotiation process led to multiple settlement offers by each of the Parties. It is notable that the Trustee obtained a personal contribution to the settlement by two Defendants above and beyond the payment of money by the Underwriters. The final Settlement amount represents a value for settlement of the Adversary Proceedings that the Trustee concluded was clearly in the best interest of the Debtors' estates.

### IV. RCT's Employment on Behalf of the Estates and its Fees

35. By Orders dated February 4, 2013, the Court approved the retention of RCT as the Trustee's Special Counsel as of December 6, 2012, based on the terms set forth in the Engagement Letter. [DE 98, 150]. A copy of the February 4, 2013 Orders are attached hereto as Exhibit C. The Engagement Letter provides that the Trustee hired RCT on a fully contingent basis whereby RCT earned a fee of 35% of any net recoveries ("**Net Recoveries**") received through settlement or other resolution of the claims against the directors and officers once Special Counsel filed a Complaint in connection with these claims (the "**RCT Post-Suit Fees**"). Paragraph 5 of the Engagement Letter defines Net Recoveries as follows: " 'Net Recoveries' shall be equal to the Gross Recoveries minus the sum of (A) Expenses (as defined in paragraph (6) below), (B) any reasonable out-of-pocket expenses incurred by Fox Rothschild, as Trustee's counsel, on or after the date of this Letter of Engagement relating to the Claims, and (C) the cost of any collection counsel hired to execute on any judgment or order." Pursuant to Paragraph 6 of the Engagement Letter, RCT shall be entitled to reimbursement of any advanced expenses from any Gross Recoveries.

14

36. As explained below, the Engagement Letter also provided that Fox Rothschild, as Trustee's Bankruptcy Counsel, would assist RCT in these specific litigation efforts and would be entitled to receive 2.5 times its hourly fees for its assistance in pursuing the claims during the post-suit phase. The Engagement Letter further provided that Fox Rothschild's fees would be deducted from the RCT Post-Suit Fees but they would not exceed 25% of the RCT Post-Suit Fees.

37. As set forth above, after paying Defendants' counsel fees in the amount of $565,000, the Trustee shall recover a total of $5,160,000 from the settlement payments. From that amount, pursuant to RCT's Engagement Letter, $14,944 of Special Counsel's out-of-pocket costs and $31.64 of Bankruptcy Counsel's out-of-pocket costs in connection with the litigation shall be deducted, deriving a Net Recovery of $5,145,024.36.

38. Applying the 35% to this Net Recovery results in an initial RCT fee of $1,800,758.53. Fox Rothschild's fees are $77,113.75. (An explanation of the retention, fee application and compensation sought by Fox Rothschild is described below.) As a result, when Fox Rothschild's fees are deducted from the initial RCT fee, the total fee of RCT is $1,723,644.77.

39. While RCT earned a fee of $1,723,644.77, RCT has agreed to reduce its fee in the amount of $115,000 in order to assist in providing the estates an additional recovery. Accordingly, in accordance with the Proposed Order attached hereto as Exhibit D, (a) RCT seeks $1,608,644.77 in fees and $14,944 in expenses, and (b) Fox Rothschild seeks fees in the amount of $77,113.75 and expenses in the amount of $31.64.

15

### V. Fox Rothschild's Employment on Behalf of the Estates and its Fees

40.     By Order dated December 1, 2010, the Trustee was authorized to retain Fox Rothschild as his general bankruptcy counsel to assist him with, among other things, (i) liquidating all known tangible assets, (ii) analyzing and pursuing claims on behalf of the Debtors' estates, (iii) reviewing and analyzing all claims filed against the Debtors' estates, and (iv) attending to all other tasks associated with the general administration of the Debtors' estates. [DE 15].

41.     In prior interim fee applications, Fox Rothschild applied for and was awarded first interim fees for services rendered as general counsel to the Trustee of Pali Holdings and Pali Capital. By this application, Fox Rothschild seeks an award of contingency fees incurred solely in connection with assisting RCT in prosecuting this litigation. As detailed below, the fees sought by Fox Rothschild in this application were separately billed, and are not included in any other fee application of the firm, past or future. These fees are wholly sought under the Order approving Fox Rothschild's partial contingency fee involvement in this litigation.

42.     As detailed above, by Order dated February 4, 2013, the Trustee was authorized to retain RCT as his special litigation counsel based on the terms set forth in the Engagement Letter. RCT recognized that, as a result of Fox Rothschild's preliminary investigation into the claims and related matters, Fox Rothschild would be a significant source of knowledge and information for RCT and that Fox's assistance would likely allow RCT to more efficiently pursue the claims. Accordingly, the Engagement Letter provides that RCT shall pay Fox Rothschild 2.5 times its hourly fees, plus reimburse its expenses, for its assistance in pursuing the claims during the post-suit phase. As mentioned above, the Engagement Letter further

16

provided that Fox Rothschild's fees would be deducted from the RCT Post-Suit Fees but they would not exceed 25% of the RCT Post-Suit Fees.

43. In accordance with the terms of the Engagement Letter, Fox Rothschild seeks aan award of fees in the amount $77,113.75 ($30,845.50 x 2.5), plus reimbursement of expenses in the amount of $31.64, to be paid from RCT's Post-Suit Fees. In order to properly account for the time billed to assist RCT with the claims, Fox Rothschild created a separate billing code for these times entries. As detailed on the time records, the fees and expenses currently sought by Fox Rothschild relate solely to those services rendered and expenses incurred in assisting RCT in pursuing the claims during the period February 5, 2013 through August 31, 2013.

44. Copies of Fox Rothschild's detailed attorney time records relevant to the instant fee application for the Pali Holdings estate and the Pali Capital estate are annexed hereto as Exhibits E and F, respectively, and a summary of the expenses incurred is annexed hereto as Exhibit G. Attached hereto as Exhibit H is a Certification of Fox Rothschild Concerning Its Second Interim Fee Application Seeking Allowance of Fees and Reimbursement of Expenses Relating to Services Rendered on Behalf of Special Litigation Counsel to be Paid Soley From Special Litigation Counsel's Contingency Fee.

45. As detailed on the annexed time records, the time spent by Fox Rothschild in assisting RCT with the claims can be generally broken down as follows:

    a. Reviewing and providing comments to the complaints and settlement letters;

    b. Assisting RCT with service related issues in connection with the Complaints;

    c. Responding to general inquiries made by RCT regarding the claims;

    d. Assisting with various document and information requests relating to the claims;

  e.  Discussing general strategy with RCT in connection with the claims; and

  f.  Discussing and analyzing various settlement offers extended by the Defendants.

46. Fox Rothschild respectfully submits that the fees and expenses currently sought are fair and reasonable and consistent with the agreement among RCT and Fox Rothschild, which was approved by this Court as part of RCT's retention.

47. The activities of RCT and Fox Rothschild are described in this Motion, as well as in the Verified Statement of Angela J. Somers, Certification of Fox Rothschild, and the related expenses are set forth in the cost summaries and invoices.[5] When counsel is engaged on a contingent fee basis and the engagement is pre-approved by the court, the court does not need to conduct an analysis of the reasonableness of the fee absent circumstances that make the retention "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *In re Smart World Technologies*, *LLC*, 552 F.3d 228, 232 (2d Cir. 2009).  There are no such circumstances in this case. The amounts for which approval is sought are within the approved terms of RCT's and Fox Rothschild's retention, and the division of fees between RCT and Fox Rothschild is fair and reasonable and consistent with the agreement between the firms.

## VI. Notice of the Motion and No Prior Request for Relief

48. The Trustee intends to serve the Notice of Hearing, the instant Motion and all exhibits upon: (i) Debtor; (ii) counsel for Defendants; (iii) counsel for the Underwriters; (iv) all parties who have formally entered their appearance and requested service pursuant to Bankruptcy Rule 2002; and (v) the United States Trustee. The Trustee shall also serve a Notice of Hearing

---

[5] Special Counsel has not included time records as exhibits to this fee application due to the contingency arrangement. If required, RCT will provide such detail subject to a redacting process.

upon all known creditors which Notice provides that this Motion shall be sent to such parties upon request.

49. There has been no prior request for the relief set forth herein.

*WHEREFORE*, the Trustee respectfully requests that the Court grant the proposed Order (i) approving the Settlement; (ii) approving and awarding their RCT and Fox Rothschild the fees and expenses; and (iii) such other, further, and different relief as the Court deems appropriate.

Dated: New York, New York
September 19, 2013

**REID COLLINS & TSAI LLP**

By: /s/Angela J. Somers
William T. Reid, IV
Angela J. Somers
Jeffrey E. Gross
One Penn Plaza, 49th Floor
New York, NY 10119
(212) 344-5200
*Special Counsel for Trustees/Plaintiff*

**FOX ROTHSCHILD LLP**

By: /s/Yann Geron
Yann Geron
Mitchell Berns
Oksana Wright
100 Park Avenue, 15th Floor
New York, New York 10017
(212) 878-7900
*Counsel for Trustees/Plaintiff*